

**FILED**

Nov 15 2016, 11:49 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Paula M. Sauer
Danville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Marco A. Galindo,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | November 15, 2016<br><br>Court of Appeals Case No.<br>32A05-1607-CR-1541<br><br>Appeal from the Hendricks Circuit Court<br><br>The Honorable Daniel F. Zielinski, Judge<br><br>Trial Court Cause No.<br>32C01-1509-MR-1 |

**Najam, Judge.**

## Statement of the Case

[1] Marco Galindo appeals his conviction for murder, a felony, following a jury

trial. He presents a single issue for our review, namely, whether the trial court

abused its discretion when it refused to instruct the jury on involuntary manslaughter. We affirm.

## Facts and Procedural History

[2] During the early morning hours of November 21, 2002, Galindo and Natalie Horsley went to a vacant apartment in Hendricks County and had sexual intercourse.[1] At some point while they were in the apartment, Galindo became angry and viciously beat and strangled Horsley for at least ninety seconds. Galindo kicked or stomped Horsley's face multiple times in addition to strangling her. Galindo then left the apartment. Galindo left Horsley severely battered on the floor without seeking medical treatment for her injuries.

[3] Later that morning, between 7:00 and 8:00 a.m., a construction crew found Horsley's dead body lying on the floor of the vacant apartment[2] and called 9-1-1. Horsley's face was covered in blood, her shirt and bra were pulled up toward her neck, exposing her bare breasts, and her underwear and pants were pulled down to her ankles, exposing her genitals. An electrician named Dylan Vaughn knew how to perform CPR, but he explained to the 9-1-1 operator that he was unable to attempt CPR on Horsley "because there appeared to be not enough face left to . . . administer it properly." Tr. Vol. I at 236. When EMTs arrived at the scene, they confirmed that Horsley was dead.

---

[1] There is no evidence that Horsley had consented to sexual intercourse with Galindo.

[2] The crew had been working on that same apartment the day before.

[4] Deputies with the Hendricks County Sheriff's Department arrived at the scene and found: blood spatter throughout the apartment and bloody footprints; semen on Horsley's abdomen; footprints in the mud outside of the apartment; and two partially-burned cigarettes. Detectives collected a DNA sample from the semen, but they could not find a match in the DNA database. An autopsy revealed that Horsley's death was caused by a combination of having been strangled and severely beaten. Detectives were unable to find a suspect. In the meantime, approximately one month after the murder, Galindo saw a poster about Horsley's death in a bar, but he did not contact law enforcement to discuss his relationship with Horsley or what had happened the night of the murder. And in 2004 or 2005, he moved to California and assumed an alias, Amado Trejo Saludes.

[5] In 2015, detectives "received information on a hit on a database" regarding the Horsley murder. *Id.* at 155. In particular, they "learn[ed] that a possible person with [the same DNA] profile [as matched the semen found on Horsley's body] had been found" in California. *Id.* Accordingly, detectives requested and obtained oral swabs from the person, Galindo a/k/a Saludes. Thereafter, Hendricks County Sheriff's Detective Scott Larsen interviewed Galindo. Galindo told Detective Larsen that he and Horsley had known each other and had occasionally engaged in sexual intercourse. Galindo stated that, the night of the murder, he and Horsley had consumed drugs and alcohol. He said that Horsley had threatened to tell Galindo's girlfriend about their relationship, and he became angry. Galindo admitted that he punched her, kicked her, and "had

her in the choke[-]type hold standing behind her with his arm around her." *Id.* at 157. Galindo denied any intent to kill Horsley, and he stated that he did not know she was dead when he left the apartment that morning. In any event, Galindo admitted that he left Horsley severely beaten on the floor of the vacant apartment without seeking medical treatment for her.

[6] The State charged Galindo with murder. At trial, Galindo proffered jury instructions on both voluntary manslaughter and involuntary manslaughter. The trial court agreed to the voluntary manslaughter instruction, but refused to instruct the jury on involuntary manslaughter, finding that there was no serious evidentiary dispute on the issue of Galindo's intent to kill Horsley. A jury convicted Galindo of murder, as charged. The trial court entered judgment of conviction and sentenced Galindo to sixty-five years executed. This appeal ensued.

## Discussion and Decision

[7] Galindo contends that the trial court abused its discretion when it refused his proffered jury instruction on involuntary manslaughter. In particular, Galindo maintains that there is a serious evidentiary dispute whether he intended to kill Horsley when he beat and strangled her. We cannot agree.

[8] At trial, Galindo proffered the following instruction:

> The crime of involuntary manslaughter is defined by statute as follows:
>
> A person who kills another human being while committing or

attempting a battery, commits involuntary manslaughter, a Class C felony.

Before you may convict the accused, the State must have proved each of the following elements:

1. Marco Galindo

2. killed Natalie Horsley

3. while committing or taking a substantial step to commit

4. a knowing or intentional

5. touching of Natalie Horsley in a rude, insolent, or angry manner.

If the State failed to prove each of these elements beyond a reasonable doubt, you must find the accused not guilty of involuntary manslaughter, a Class C felony.

Appellant's App. at 88.

[9]     As we explained in *Erlewein v. State*, 775 N.E.2d 712, 714 (Ind. Ct. App. 2002),

*trans. denied*,

[w]hen called upon by a party to instruct a jury on a lesser included offense of the crime charged, a trial court must perform a three-step analysis. First, it must compare the statute defining the crime charged with the statute defining the alleged lesser included offense to determine if the alleged lesser included offense is inherently included in the crime charged. *Wright v. State*, 658 N.E.2d 563, 566 (Ind. 1995). Second, if a trial court determines that an alleged lesser included offense is not

inherently included in the crime charged under step one, then it must determine if the alleged lesser included offense is factually included in the crime charged. *Id.* at 567. Third, if a trial court has determined that an alleged lesser included offense is either inherently or factually included in the crime charged, it must look at the evidence presented in the case by both parties to determine if there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater. *Id.* It is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense if there is such an evidentiary dispute. *Id.* "If the evidence does not so support the giving of a requested instruction on an inherently or factually included lesser offense, then a trial court should not give the requested instruction." *Id.*

"Involuntary manslaughter is not an inherently included lesser offense of murder." *Evans v. State*, 727 N.E.2d 1072, 1081 (Ind. 2000). "But it is a 'factually included' lesser offense if the charging instrument alleges that a battery accomplished the killing." *Id.* Here, the State does not challenge Erlewein's assertion that involuntary manslaughter was factually included in the murder charge against him because the information alleged that he killed A.E. by battering her, i.e. knowingly or intentionally touching A.E. in a rude, insolent, or angry manner. *See* Ind. Code § 35-42-2-1(a). Instead, the State focuses its argument on whether there was a serious evidentiary dispute regarding the element distinguishing involuntary manslaughter from murder. "The critical element distinguishing involuntary manslaughter from murder in this case is intent—the intent to kill or the intent to batter." *See Evans*, 727 N.E.2d at 1081.

We note that in deference to the trial court's proximity to the evidence, we review a decision whether to instruct the jury on lesser included offenses for an abuse of discretion if the court makes a finding as to the existence or lack of a "serious

evidentiary dispute." *McEwen v. State*, 695 N.E.2d 79, 84 (Ind. 1998).

[10] Here, it is undisputed that involuntary manslaughter is a factually lesser-included offense of murder in light of the charging information, which alleged that Galindo caused Horsley's death by battering her. The only issue is whether there is a serious evidentiary dispute that Galindo intended to kill Horsley. Galindo acknowledges that, "[w]hile a verbal denial of the requisite criminal intent does not automatically create a serious evidentiary dispute . . . , it is a factor this Court should consider when reviewing the denial of a lesser-included instruction." Appellant's Br. at 18. And Galindo contends that his "statements denying his intent to kill, in conjunction with evidence which supported his description of events, establishes a serious dispute concerning [his] intent." *Id.* at 18-19. In particular, Galindo maintains that the evidence shows: "the choking incident may have occurred before the couple had sex"; "when precisely Horsley died could not be determined by the State's experts"; "while Horsley was badly bloodied and bruised, her skull was not fractured and her teeth were intact"; the apartment was dark, "making it difficult for Galindo to know how badly Horsley was hurt"; and Galindo "heard Horsley groan and say something to him" as he left the apartment. *Id.* at 16-18.

[11] This court's opinion in *Erlewein* is instructive here. In that case, the defendant had beaten his victim "with sufficient force to knock out her partial dental plate and to leave numerous contusions on her head and body." *Erlewein*, 775 N.E.2d at 713. In addition, the evidence showed that Erlewein

got behind A.E., placed his right arm around her neck, and choked her until she died. He made no effort to resuscitate her or contact emergency medical personnel. [He subsequently] called his mother-in-law, his pastor, and his own mother . . . before he called 911 . . . to report that he had killed A.E.

*Id.*

[12] After his conviction for murder, Erlewein appealed and argued that the trial court abused its discretion when it did not give an involuntary manslaughter jury instruction. There, as here, the sole issue on appeal was whether there was a serious evidentiary dispute regarding the defendant's intent to kill his victim. Erlewein contended that his denial that he had intended to kill A.E., combined with the physical evidence of the battery resulting in her death, showed a serious evidentiary dispute to support the involuntary manslaughter instruction. But the evidence showed that A.E. died of asphyxiation by strangulation, which, the State's expert testified, "would have taken a minimum of forty-five seconds to as much as four minutes. *Choking someone for a minimum of forty-five seconds clearly evinces an intent to kill or, at the very least, an awareness of a high probability that death would result.*" *Id.* at 715.

Additional evidence of Erlewein's mens rea [came] from his failure to take any action to try to resuscitate A.E. and waiting nearly two hours to call 911[] and his beating of A.E. before he choked her. . . . Erlewein's initial interviews with law enforcement were also deceptive, as he denied having any recollection of what occurred other than finding himself with his arm around A.E.'s neck and her not moving, in contradiction to Erlewein's trial testimony. He also denied having beaten A.E. prior to her strangulation, claiming he remembered nothing in

between the time when he and A.E. were talking and when he removed his arm from around her neck.

*Id.* (emphasis added). Given that evidence, we held that there was no serious evidentiary dispute that Erlewein intended to kill A.E. and the trial court did not abuse its discretion when it refused to instruct the jury on involuntary manslaughter.

[13] The evidence here is analogous to that in *Erlewein* and shows that Horsley died from a combination of being severely beaten and strangled for at least ninety seconds. In particular, the State presented the following evidence:

> Q: So, doctor, you had indicated that one of the causes of death was strangulation. Is that correct?
>
> A: Correct.
>
> * * *
>
> Q: Approximate[ly] how long does it take someone to strangle another human being to death?
>
> A: It can be as little as one and [a] half minutes.
>
> * * *
>
> Q: Okay, but it is your testimony that at least ninety seconds, by your studies, would have to occur before someone be strangled to death?
>
> A: That's correct.
>
> * * *

Q: Okay. In addition to the abrasion which you see to the neck and to the bruising, do you look for anything else to determine the cause of death of strangulation?

A: Yes, you do.

Q: Okay. I'm going to show you. I'll put up both of these. I'm going to put two photos up here of 93 and 94. Now we're looking at her eye, and obviously not her neck, could you explain the significance of these two photographs?

A: Yes, these are uh magnified images of both left and right eyes. This is the right eye here, and what we're seeing is that there are blood vessels that have hemorrhaged within the uh (inaudible) or the white portion of the eye. It's (inaudible). We look for these signs in strangulation cases. We also see this in the left eye, these hemorrhages. This is from small vessels under pressure that rupture . . . from pressure.

Q: Is this very consistent in a strangulation death?

A: Yes, it is.

Q: Okay, and this is what you commonly find? Can you tell by this, the amount of force that was used to strangle her to death?

A: Again, this is uh *extensive force*, and it's *prolonged* to have these blood vessels rupture to this degree.

Q: Okay. Is there anything internally you look at to, inside the body also to look for uh strangulation?

A: Yes, you want to examine the neck.

\* \* \*

Q: Okay. Is there any damage here to the larynx?

A: There's some bruising here. This is on the uh left side in the back, and there's some bruising where the (inaudible) is on top of the uh larynx. So here's an area of bruising there.

Q: Does this help you also determine that one of the causes of death was strangulation?

A: Yes sir.

Q: Okay. Now I'm going to show you photos now of the brain area of 96 and 97, and I guess I would like to start here, kind of out of order. Could you explain 97, what we're looking at?

A: 97 is uh the right side of the head. . . . First of all, you have large areas of bruising here within the scalp tissue itself. The skull has been removed. This is what we call the dura mater or the dura lining, and just under this dura, there's what we call sub-dura uh hemorrhage. That means blood's out of the vascular space, and actually on the brain itself, and it can cause pressure on the brain, and this picture also shows that the brain actually is swollen, or what we call cerebral edema.

Q: But what does that mean about swollen? Can you explain that a little more?

A: One of the brain's reactions to any insult is to swell, increasing its circulation, increasing blood to get oxygen. That's one thing that happens, and it becomes a vicious cycle, the brain trying to get more oxygen. Uh so we see the swelling by these areas here looking flat. Uh and then the other insult would be to have blood out of the uh vessel that will cause direct pressure onto the brain itself.

Q: Is this representative of blunt force trauma, or strangulation, or of both?

A: This is *a combination of both*. You have blunt force trauma with the bleeding, and the injury to the scalp. You also have uh swelling as a reaction to lack of oxygen.

Q: Okay. And on this particular injury right here, could you please explain this on State's 96?

A: Uh this is representative of bl[unt] force trauma. This is the left side of the head. Again, you see the scalp tissue, multiple areas of bruising, and then you actually have bruising on the uh tissue that's right on the uh skull itself. So you have multiple impact sites where trauma has been received, uh, impact to the skull itself.

Q: Would this be consistent if someone was being injured to their face, and they were on a hard surface of the (inaudible) of the back of the head hitting the hard surface?

A: Uh that could be, yes.

* * *

Q: Okay, and regardless of the injury of the blunt force to the face, there's a total *second cause of death of strangulation*? Is that correct?

A: Yes.

Q: Did you look at different graphs here, and I'm going to show you now 99. I'm going to show you 99 and 100, and ask you to explain these images to the jury.

A: These are diagrams normally used, as [the] pathologist take[s] notes while they're doing examinations. Uh this one is of the head. We have on the right side . . . notes as to multiple uh contusions, this is uh a drawing of what we've seen earlier from the photographs. This is also drawing the injury to the lip. This

area is encompassing the nose and both eyes. On the left side, there's a contusion that we're actually seeing on the skull itself, or that bruising there, and then the back of the uh skull on the left side is a very large area that we just saw on the photograph of that uh deep contusion to the uh back of the left side of the head, the skull.

Q: And Dr. Carter, if I understand correctly, you are talking about multiple injuries. Is that fair to say?

A: Multiple impact sites.

Q: Can you uh make a total determination of how many?

A: There are more than *five impact sites* to the head region.

Q: Okay. Any idea the amount of force that was used?

A: Again, this is *tremendous force*. Many of these injuries are overlapping. You see some patterns of dark discoloration in the photographs, and uh you can see that the injuries are bilateral and at the back of the head as well.

* * *

Q: Okay. Now doctor you had indicated there's *two causes of death*, blunt force trauma and strangulation. Are you able to determine which came first?

A: No.

Q: And why is that?

A: Uh we have to be practical in what we see. It's difficult to say which one came first. *They are at the same time*, due to the coloration of the injuries on the skin, and so they are rightfully combined as uh strangulation and blunt force trauma to the head.

Q: Could either one of them by themselves have been a source of the cause of her death?

A: Yes.

Q: Okay, but in this case you determined that as a combination. Is that correct?

A: That is correct.

Tr. Vol. II at 181-89 (emphases added). That evidence shows more than an intent to merely batter Horsley. That evidence shows Galindo's intent to kill her both through battery and by strangulation. In addition, the undisputed evidence shows that Galindo did not seek medical treatment for Horsley after he beat and strangled her, and he did not contact the police after he heard about Horsley's death.

[14]    Horsley died as a result of both the "tremendous force" of the beating *and* being strangled for at least ninety seconds. *Id.* at 187. As we held in *Erlewein*, "[c]hoking someone for a minimum of forty-five seconds clearly evinces an intent to kill or, at the very least, an awareness of a high probability that death would result." *Erlewein*, 775 N.E.2d at 715. The evidence here clearly supports the trial court's determination that there is no evidentiary dispute regarding Galindo's intent to kill Horsley.

[15]    We reject Galindo's attempt to distinguish these facts from those in *Erlewein* because, as he alleges, the evidence does not show "whether Horsley died from

strangulation or beating." Reply Br. at 5. In essence, Galindo argues that, if Horsley died from the beating, that evidence is consistent with his version of events leading up to her death, and, as he stated in his interview with Detective Larsen, he did not intend to kill her. But the evidence shows that Horsley died from a *combination* of the strangulation and the beating, and the evidence showed further that Galindo used "extensive" and "prolonged" force in strangling Horsley. Tr. Vol. II at 183. The undisputed evidence also shows that either the blunt force trauma or the strangulation would have been sufficient to kill Horsley.

[16] Galindo kicked or stomped Horsley in the head multiple times and strangled her with extensive and prolonged force. All of the evidence in this case contradicts Galindo's general denial that he did not knowingly or intentionally kill Horsley. *See Erlewein*, 775 N.E.2d at 716. Galindo's contentions on appeal amount to a request that we reweigh the evidence, which we will not do. The trial court did not abuse its discretion when it refused to instruct the jury on involuntary manslaughter.

[17] Affirmed.

Vaidik, C.J., and Baker, J., concur.