

FILED

Jul 09 2020, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer G. Shircliff
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael Philip Atkinson, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | July 9, 2020 <br><br> Court of Appeals Case No. 19A-CR-2568 <br><br> Appeal from the Hendricks Superior Court <br><br> The Honorable Stephenie LeMay Luken, Judge <br><br> Trial Court Cause No. 32D05-1811-MR-3 |

**Tavitas, Judge.**

## Case Summary

[1] Michael Atkinson appeals his conviction for murder. We affirm.

## Issues

Atkinson raises two issues for our review, which we revise and restate as follows:

> I.      Whether the trial court erred in refusing Atkinson's proposed jury instruction on reckless homicide as a lesser included offense of murder.

> II.      Whether the trial court erred in refusing Atkinson's proposed jury instruction on involuntary manslaughter as a lesser included offense of murder.

## Facts

In November 2017, Alyssa Cullen lived at her home in Danville with her children, four-year-old J.S. and five-year-old M.S.; her boyfriend, Atkinson; and Atkinson's two children, who were three-years-old and one-year-old in 2017.[1] J.S. was diagnosed with and took medication for high-functioning autism, obsessive-compulsive disorder ("OCD"), and defiance disorder. J.S. was an active and sometimes "difficult" and "frustrating" child. Tr. Vol. II p. 199. The week prior to November 11, 2017, J.S. had a cold, ran a high fever, had a runny nose, and vomited once. By November 11, 2017, J.S. had improved, but he still acted tired and not quite himself.

---

[1] Atkinson's two children only lived in Cullen's home when Atkinson was exercising his parenting time with his children.

On November 11, 2017, Cullen took her children to the mall where they met Cullen's mother. Cullen, who helped J.S. get dressed before they left the house, did not observe anything unusual on J.S.'s body other than minor injuries or bruises a four-year-old typically sustains. Similarly, while at the mall, Cullen's mother assisted J.S. in using the restroom and did not observe any significant marks or bruises on J.S. Later that evening, Cullen met friends for a concert and left Atkinson with J.S., M.S., and Atkinson's two children at the home. According to Cullen, the home was "chaotic" due to the number of people and the children "running around laughing [and] playing." *Id.* at 204.

While Cullen was out, Atkinson sent Cullen a text message indicating that Atkinson believed he had identified the source of J.S.'s stomachaches the week prior based on J.S. having a significant bowel movement. Sometime later that evening, Atkinson notified Cullen that J.S. was not breathing, and Cullen needed to return home immediately. Atkinson called 911.

When the medics arrived, Atkinson was performing CPR on J.S. in the living room.[2] Medics took over and began performing life-saving techniques; J.S. did not have a pulse and was not breathing. Medics observed bruising on J.S.'s abdomen and on the back of J.S.'s head. Atkinson reported to the medics that J.S. had fallen in the shower.

---

[2] According to one EMT who arrived on the scene, Atkinson was performing CPR incorrectly.

[7] Officer Josh Gauger, with the Danville Police Department, was dispatched to Cullen's home. Atkinson was the only adult present in the home when Officer Gauger arrived. The other children were sleeping in their bedrooms. According to Officer Gauger, Atkinson looked concerned. Shortly thereafter, Cullen arrived home while the medics were tending to J.S.

[8] J.S. was transported to Hendricks Regional Health ("Hendricks Regional"). At Hendricks Regional, Officer Gauger interviewed both Atkinson and Cullen, took photographs of J.S., contacted Indiana Department of Child Services ("DCS"), and turned the case over to detectives. Dr. Mark Collins, an emergency physician at Henricks Regional, treated J.S. Dr. Collins observed that the unresponsive J.S. was "literally covered in bruises," except on his face. *Id.* at 126. J.S. also had "an impression on his lower abdomen and swelling in the scrotum," which led Dr. Collins to believe that J.S. had sustained an internal injury. *Id.* at 127. Dr. Collins' impression was that J.S. "had sustained some sort of trauma." *Id.* The bruises on J.S.'s side led Dr. Collins to believe that "some sort of pressure [was] applied to the front of [J.S.]" because the bruises on the side of J.S.'s body were located in a "very hard" and "odd" place to bruise. *Id.* at 129.

[9] J.S. was transported to Riley Hospital for Children ("Riley") where he was treated by pediatrician Dr. Ralph Hicks in the pediatric intensive care unit in

the early morning hours of November 12, 2017.[3] J.S. remained unresponsive while at Riley, and the following day, on November 13, 2017, J.S. was pronounced dead.

[10] At Riley, Atkinson was interviewed by detectives. During the interview, Atkinson reported that J.S. fell in the shower, hit his head, and began to bleed.[4] After J.S.'s shower, J.S. sat with Atkinson on the couch, Atkinson and J.S. fell asleep on the couch, and approximately an hour and one-half later, Atkinson put J.S. to bed. Atkinson stated that he checked on J.S. approximately fifteen minutes later only to discover that J.S. had not moved and was not taking full breaths; therefore, Atkinson carried J.S. to the living room and attempted CPR. Atkinson denied knowledge of how J.S. sustained his injuries and, in fact, when pressed by officers about whether Atkinson may have accidentally hurt J.S., Atkinson responded to investigators unequivocally that he did not hurt J.S.

[11] On November 14, 2017, investigators went to Cullen's house to photograph and collect evidence.[5] The photographed evidence included: a bath rug and bath towels, which appeared to contain blood or feces; the pillow on J.S.'s bed, which contained blood; and a hole in the wall in J.S.'s closet. Detectives also obtained camera footage from a nanny camera in J.S.'s bedroom; however, it

---

[3] Dr. Hicks is board certified in child abuse pediatrics.

[4] Cullen testified that J.S. had a minor cut on the back of his head from an injury at daycare. During Atkinson's interview, Atkinson indicated that he believed that J.S. began bleeding from that cut when he fell.

[5] Prior to the search, the home was not sealed off as a crime scene; therefore, individuals could still access the home.

appeared that portions of the video had been deleted or the recorder stopped recording; the video did not depict Atkinson's account that Atkinson checked on J.S. after putting J.S. to bed.

[12] Investigators found a hole in the back of J.S.'s bedroom closet approximately three and one-half by three and one-half inches. Expert testimony was presented that a hair sample found above the hole on the wall in J.S.'s closet was one trillion times more likely to come from J.S. than to come from an unknown individual. Analysis revealed that DNA from J.S.'s pillow, which contained blood, was one trillion times more likely from J.S. than from an unknown individual. Similarly, blood found on a bath towel collected from the residence was one trillion times more likely to come from J.S. than an unknown individual.

[13] On January 17, 2018, Atkinson was charged with Count I, aggravated battery, a Level 1 felony and Count II, neglect of a dependent resulting in death, a Level 1 felony. On October 1, 2018, the State filed a motion to add Count III, murder, a felony. The trial court granted the State's motion.

[14] Atkinson's jury trial was held in September 2019. Witnesses testified to the foregoing facts. Cullen testified that the bruises she observed on J.S. at Riley were not present when she left J.S. in Atkinson's care on November 11, 2017. Cullen testified that, since November 11, 2017, she has been unable to locate a metal towel bar, which had fallen off the wall and was stored behind the toilet in the bathroom at her home. Cullen also testified that the hole in J.S.'s closet

wall was not present in the weeks leading up to November 11, 2017; she testified that she had been in J.S.'s closet previously and was confident she would have noticed the hole.

[15] Cullen testified that the night before Atkinson was charged, he apologized to Cullen because he admitted responsibility for J.S.'s injuries. Atkinson insisted to Cullen that he did not hit, kick, or punch J.S.; however, Atkinson instead indicated that he felt responsible because he was responsible for caring for J.S. Finally, Cullen testified that her daughter, M.S., reported to her that she heard a "thud" in the bathroom and found J.S. on the floor of the bathtub the night of the incident. *Id.* at 222. Additionally, Jeffrey Burger, Atkinson's cell block mate in the Hendricks County Jail, testified that Atkinson disclosed to Burger, while they both were in the jail, that Atkinson was responsible for J.S.'s injuries.

[16] Regarding the cause of J.S.'s injuries, Zachary Gruner, one of the EMTs who attended to J.S., testified that J.S.'s injuries were inconsistent with what he typically sees in shower slip-and-fall calls. Dr. Collins similarly testified that J.S.'s injuries were not consistent with a fall in the bathtub, and Dr. Collins' impression was that J.S. had been "beaten to death." *Id.* at 133. Dr. Collins further testified that J.S.'s bloodwork revealed severe anemia, which is consistent with internal bleeding and trauma.

[17] Dr. Hicks testified regarding his examination of J.S.'s CT scans, which revealed subdural hematomas, bruises on J.S.'s lungs, blood in J.S.'s abdomen, and

apparent injuries in J.S.'s spleen, bowel wall, and pelvis. Dr. Hicks also testified that it appeared J.S. sustained a forceful impact to the head; J.S.'s injuries did not appear to come from a single fall in the shower; and J.S.'s injuries were "characteristic of inflicted, non-accidental trauma." *Id.* at 159. Dr. Hicks further testified that the blows needed to cause the internal injuries J.S. sustained "would have to be very forceful and violent." *Id.* at 158. According to Dr. Hicks: (1) he did not believe that a child with the fatal brain injury J.S. sustained would be acting "normal[ly]" after this type of injury; and (2) symptoms from the injury "would occur either immediately or very shortly after whatever happened to cause the injuries." *Id.* at 163-64.

[18] Dr. John Cavanaugh, a child death pathologist at the Marion County Coroner's Office, performed a forensic autopsy on J.S. on November 14, 2017, three days after J.S.'s death. Dr. Cavanaugh testified that J.S.'s cause of death was a homicide through "multiple blunt force traumatic injuries without adequate explanation inconsistent with a simple accidental fall"; Dr. Cavanaugh opined that J.S.'s injuries occurred through multiple blows and falls. Tr. Vol. III p. 70. Dr. Cavanaugh also noted that the injuries to J.S. included multiple blunt force traumatic injuries to the head, and blunt force injuries to the chest, abdomen, and pelvis. Dr. Cavanaugh testified that J.S.'s brain injuries were consistent with an injury that would have occurred anywhere between two to four days prior to the autopsy.

[19] Atkinson filed his proposed final instructions to the trial court, which included proposed instructions for the lesser included offenses of involuntary

manslaughter and reckless homicide. The trial court denied Atkinson's request to include both instructions for involuntary manslaughter and reckless homicide.

[20] The jury found Atkinson guilty on all counts as charged. The trial court vacated Counts I and II due to double jeopardy concerns and sentenced Atkinson on the murder conviction to sixty-five years in the Indiana Department of Correction. Atkinson now appeals his conviction.

## Analysis

[21] Atkinson was convicted of murder. Murder is defined in Indiana Code Section 35-42-1-1(1) as any person who "knowingly or intentionally kills another human being." Atkinson argues that the trial court erred when it refused to give Atkinson's proposed final jury instructions on both reckless homicide and involuntary manslaughter as lesser included offenses. "The trial court has broad discretion as to how to instruct the jury, and we generally review that discretion only for abuse." *Kane v. State,* 976 N.E.2d 1228, 1231 (Ind. 2012) (citing *Mayes v. State,* 744 N.E.2d 390, 394 (Ind. 2001)).

[22] In *Evans v. State,* 727 N.E.2d 1072, 1080-81 (Ind. 2000), our Supreme Court summarized the law regarding whether a trial court should instruct on a lesser included offense:

> In *Wright v. State,* 658 N.E.2d 563 (Ind. 1995), this Court set forth a three-part test for determining when a trial court should instruct on a lesser included offense. Part one requires the trial court to determine whether the lesser offense is "inherently" included in

the offense charged by comparing the statute defining the crime charged with the statute defining the alleged lesser included offense. *Id.* at 566-67; *see also Wilson v. State,* 697 N.E.2d 466, 473 (Ind. 1998). If necessary, part two of the *Wright* test alternatively requires the trial court to determine whether the lesser offense is "factually" included in the offense charged by comparing the charging instrument with the statute defining the alleged lesser included offense. *Wright,* 658 N.E.2d at 567.

Finally, if the court concludes that the lesser offense is either inherently or factually included in the offense charged, then part three requires the court to determine whether a serious evidentiary dispute exists as to which offense was committed by the defendant, given all the evidence presented by both parties. *Id.* If a serious evidentiary dispute does exist, it is reversible error not to give the instruction on the inherently or factually included lesser offense. *Id.*

[23] "We review for an abuse of discretion a trial court's factual finding on the existence *vel non* of a 'serious evidentiary dispute.' *Garrett v. State,* 964 N.E.2d 855, 857 (Ind. Ct. App. 2012) (quoting *Champlain v. State,* 681 N.E.2d 696, 700 (Ind. 1997). "If the trial court makes no ruling as to whether there is a serious evidentiary dispute," we are required to "make that determination *de novo*" based on our review of the evidence. *Garrett,* 964 N.E.2d at 857-58.

## I. *Reckless Homicide Instruction*

[24] First, Atkinson argues that the trial court erred in failing to give the jury a proposed instruction for reckless homicide. Atkinson's proposed final jury instruction on reckless homicide stated, in relevant part:

The crime of Reckless Homicide is included in the charged crime of Murder.[6]

The crime of Reckless Homicide is defined by law as follows: A person who recklessly kills another human being commits reckless homicide, a Level 5 felony.

Before you may convict the Defendant, the State must have proved each of the following beyond a reasonable doubt:

    1. The Defendant

    2. recklessly

    3. killed

    4. [J.S.]

If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of Reckless Homicide as included in Count 3.

Appellant's App. Vol. II p. 171.

[25] At trial, Atkinson argued the trial court should have included this instruction because (1) the evidence was submitted that Atkinson fell asleep while he was babysitting the children; (2) there was no evidence he was upset or displeased

---

[6] Indiana Code Section 35-42-1-5 states: "A person who recklessly kills another human being commits reckless homicide, a Level 5 felony."

about babysitting the children; (3) Atkinson attempted CPR; (4) Atkinson called 911; and (5) Atkinson was emotional and cried when Cullen arrived home. Therefore, Atkinson argued, if he did something or failed to do something, he did so recklessly and not knowingly. The State argued, however, reckless homicide was an improper jury instruction because Atkinson did not assert that he was reckless in J.S.'s death; instead, Atkinson asserted that J.S. fell in the bathtub and Atkinson was not involved in any way in J.S.'s death.

[26] In looking at the first step of the *Wright* analysis regarding whether the offense is inherently included, we note that reckless homicide is an inherently included lesser offense of murder. *See Webb v. State,* 963 N.E.2d 1103, 1106 (Ind. 2012). The only difference between murder and reckless homicide is the state of mind required for each. *See id.; see also* Ind. Code § 35-41-2-2(c) ("A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct"); *see also* Ind. Code § 35-41-2-2(b) ("A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so"); *see also* Ind. Code § 35-41-2-2(a) ("A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so.").

[27] We must ask, therefore, whether there was a serious evidentiary dispute regarding Atkinson's state of mind that would require the reckless homicide instruction. The trial court stated on the record when ruling on Atkinson's proposed reckless homicide instruction:

At no time is there any defense that this child was injured accidentally through testimony from your client or through statements prior to trial from your client. That I am declining at this point in time the defense is basically I didn't do it, I did not commit these injuries, that's your client's absolute right to have that defense, and he's been consistent uh, throughout his statements to law enforcement throughout the investigation and through, nothing has changed through this trial. I am declining to give the lesser included offense of reckless homicide, *there is nothing in the evidence* that supports that lesser included offense at this time.

Tr. Vol. III p. 51 (emphasis added). Because the trial court made these findings, we will review the question of whether a serious evidentiary dispute exists and whether the trial court abused its discretion. *See McEwen,* 695 N.E.2d at 85 ("Although not using the terminology of *Wright,* the court made the functional equivalent of a finding on the existence or lack of serious evidentiary dispute as to McEwen's reckless behavior").

[28]     Atkinson argues his state of mind can be shown by the following evidence: (1) he was calm when Cullen left the house for the evening; (2) he was content babysitting the children for the evening; (3) Atkinson was in regular contact with Cullen; (4) Atkinson called 911; and (5) Atkinson attempted to perform CPR. *See* Appellant's Br. p. 16. The State responds that the severity of J.S.'s injuries was such that Atkinson's actions, which resulted in J.S.'s death, could have only occurred knowingly.

[29]     Our Court addressed a similar issue in *McDowell v. State*, 102 N.E.3d 924 (Ind. Ct. App. 2018), *trans. denied*. In *McDowell,* McDowell called 911 to report that

his girlfriend was unconscious. When paramedics arrived, they confronted McDowell about the numerous bruises on the girlfriend's body, and McDowell responded to paramedics that he and his girlfriend had gotten into a fight. McDowell's girlfriend ultimately succumbed to her injuries. Evidence from the scene revealed scratches on McDowell's face, a shoeprint on the girlfriend's shirt consistent with one of McDowell's shoes, the girlfriend's blood on the door of the bathroom, and the presence of McDowell's skin under the girlfriend's fingernails. McDowell also admitted to an officer that he killed his girlfriend, but then later denied it.

[30]  McDowell was charged and convicted of murder. The trial court refused McDowell's tendered jury instruction on reckless homicide, but the trial court did instruct the jury regarding voluntary manslaughter. In his petition for post-conviction relief, McDowell argued that he received ineffective assistance of counsel because his trial counsel did not request an instruction on reckless homicide. Our Court found on appeal that, even if trial counsel had requested the instruction, it could not have been properly given. Our Court observed that the "beating" that caused the victim's injuries was "so severe that no reasonable person could have found it to have been inflicted only recklessly without also having been done knowingly." *McDowell*, 102 N.E.3d at 932. Accordingly, our Court concluded: "[t]o beat someone as severely as [the victim] was beaten goes well beyond the realm of acting recklessly[.]" *Id. See also Brown v. State,* 512 N.E.2d 173, 177 (Ind. 1987) ("Given the severity of the victim's injuries, the nature in which they were inflicted, and the fact that some were several days

old, we conclude that the trial court properly refused to give Brown's tendered instructions [regarding battery and reckless homicide]. . . . The injuries were too extensive to support a mere touching or reckless act on Brown's part.").

[31] *McDowell* is instructive to our analysis here. J.S. sustained injuries which led Dr. Collins to conclude that J.S. was beaten to death. Dr. Hicks similarly concluded that the trauma necessary to cause these injuries would have been "forceful" and "violent," and "something that any reasonable bystander would immediately recognize as being potentially dangerous for the child." Tr. Vol. II p. 158. J.S.'s CT scans revealed multiple subdural hematomas, bruises on J.S.'s lungs, blood in J.S.'s abdomen, and apparent injuries to J.S.'s spleen, bowel wall, and pelvis.

[32] J.S.'s injuries were so severe that no reasonable person could have found the injuries to have been inflicted only recklessly. The record reveals no serious evidentiary dispute that Atkinson acted knowingly instead of recklessly. Accordingly, the trial court did not abuse its discretion in refusing to give the reckless homicide instruction.

## II.    *Involuntary Manslaughter Instruction*

[33] Atkinson also argues the trial court erred in failing to instruct the jury regarding involuntary manslaughter. Atkinson's proposed final jury instruction on involuntary manslaughter stated, in relevant part:

The crime of Involuntary Manslaughter is included in the charged crime of Murder.[7]

The crime of involuntary manslaughter is defined by statute as follows: A person who kills another human being while committing or attempting to commit (1) a Level 5 or Level 6 felony that inherently poses a risk of serious bodily injury; (2) a class A misdemeanor that inherently poses a risk of serious bodily injury; or (3) battery; commits Involuntary Manslaughter, a Level 5 felony.

Before you may convict the Defendant, the State must have proved each of the following elements:

    1. The Defendant

    2. killed [J.S.]

    3. while committing

    4. a battery

    5. by knowingly

---

[7] Indiana Code Section 35-42-1-5(b) states:

    A person who kills another human being while committing or attempting to commit:

        (1) a Level 5 or Level 6 felony that inherently poses a risk of serious bodily injury;

        (2) a Class A misdemeanor that inherently poses a risk of serious bodily injury; or

        (3) battery;

    commits involuntary manslaughter, a Level 5 felony.

6. touching [J.S.]

7. in a rude, insolent, or angry manner

If the State failed to prove each of these elements beyond a reasonable doubt, you should find the Defendant not guilty of involuntary manslaughter.

Appellant's App. Vol. II pp. 171-72.

[34] "[I]nvoluntary manslaughter is not an inherently included lesser offense of murder." *Blackburn v. State,* 130 N.E.3d 1207, 1212 (Ind. Ct. App. 2019). Atkinson's argument, however, is that the tendered involuntary manslaughter instruction should have been given as a factually lesser included offense, according to the second prong of *Wright*. This prong requires us to consider whether the offense is a factually lesser included offense due to the fact that the State also charged Atkinson with aggravated battery. *See* Ind. Code § 35-42-1-5(b) (defining involuntary manslaughter as the killing of another while attempting to inflict serious bodily injury or committing a battery). The State responds that the charging information regarding the murder itself did not allege a battery, which would factually foreclose an involuntary manslaughter instruction.

[35] Generally, the State can foreclose an instruction on involuntary manslaughter as a lesser included offense based on the chosen wording of the charging information. *See Wright,* 658 N.E.2d at 570 ("the State may only foreclose instruction on a lesser offense that is not inherently included in the crime

charged by omitting from a charging instrument factual allegations sufficient to charge the lesser offense."); *see c.f., Evans,* 727 N.E.2d at 1081 (finding that, because the charging information alleged that the defendant killed the victims by means of a knife, involuntary manslaughter was a factually included lesser offense).

[36] The charging information with regard to the murder alleged: "[o]n or about November 11, 2017, in Hendricks County, Indiana, [Atkinson] did knowingly kill another human being, to wit: [J.S.]." Appellant's App. Vol. II p. 92. Atkinson was separately charged with aggravated battery, a Level 1 felony. The battery charging information alleged that Atkinson "did knowingly or intentionally inflict injury on [J.S.] that created a substantial risk of death and did result in the death of [J.S.], a child less than fourteen years of age." *Id.* at 14. Neither party cited cases in its brief to support or contradict the argument that when a defendant is charged with a battery *in addition to* murder, the involuntary manslaughter instruction must be tendered to the jury, even when the charging information for the murder itself does not allege a battery.

[37] Nonetheless, our Supreme Court has repeatedly held that the State may foreclose instruction on a lesser included offense that is not an inherently lesser included offense "by omitting from a charging instrument factual allegations sufficient to charge the lesser offense." *Wright,* 658 N.E.2d at 570. In other words, the State has the discretion to draft the charging information in such a way that precludes instruction on a factually lesser included offense. Here, the charging information for the murder itself does not discuss a battery. If the

State chose to risk obtaining a conviction for murder or nothing—instead of having the opportunity to argue at least for a lesser included offense—that is the State's prerogative to do so. Because the charging information with regard to the murder did not allege a battery, an instruction for involuntary manslaughter was factually excluded. Accordingly, Atkinson was not entitled to an instruction on involuntary manslaughter.

[38] Nonetheless, even if we were to find involuntary manslaughter is a factually included lesser offense, there was no serious evidentiary dispute that would entitle Atkinson to an instruction on involuntary manslaughter. If involuntary manslaughter was a factually included lesser offense, we would be required to consider this third step of the *Wright* test because, "if the court concludes that the lesser offense is either inherently or factually included in the offense charged, then part three requires the court to determine whether a serious evidentiary dispute exists as to which offense was committed by the defendant, given all the evidence presented by both parties." *Evans,* 727 N.E.2d at 1081. The trial court merely stated on the record that it was going to decline to give the instruction regarding involuntary manslaughter; therefore, we review this issue *de novo. Garrett,* 964 N.E.2d at 857-58.

[39] A panel of our Court addressed this issue in *Galindo v. State,* 62 N.E.3d 1285, 1292 (Ind. Ct. App. 2016). In *Galindo,* the charging information alleged that Galindo caused the victim's death by battering her; therefore, our Court found that involuntary manslaughter was a factually included lesser offense due to the language of the charging information. Our Court, however, found no

evidentiary dispute when it moved to the third step of the *Wright* analysis, and concluded: "Galindo kicked or stomped [the victim] in the head multiple times and strangled her with extensive and prolonged force. All of the evidence in this case contradicts Galindo's general denial that he did not knowingly or intentionally kill [the victim]."[8] *Galindo,* 62 N.E.3d at 1292.

[40] As in *Galindo,* we must consider whether Atkinson intended to batter or kill J.S. Based on the evidence before us, we find no serious evidentiary dispute in the evidence regarding Atkinson's intent. The State introduced testimony from J.S.'s treating doctors that J.S. sustained serious, forceful, and traumatic injuries. The State also introduced photographs of J.S.'s swollen body, which was covered in bruises, and a gash in J.S.'s head, which reflects a brutal and violent beating consistent with Dr. Collins' testimony that J.S. was beaten to death. Finally, the State introduced the interview of Atkinson at Riley where Atkinson told detectives that J.S. fell in the shower and that Atkinson did not know how J.S. sustained his injuries; however, the State also presented overwhelming evidence that Atkinson's explanation is implausible.

[41] Atkinson did not present any evidence during his case-in-chief and presented no defense that Atkinson's intent was merely was to batter, instead of knowingly kill, J.S. Accordingly, there was no evidentiary dispute for the jury to resolve.

---

[8] There was also evidence in *Galindo* that Galindo did not call 911 to assist the victim with her injuries. Although, here, Atkinson called 911 to aid J.S., this fact alone is not dispositive, and we find other evidence, such as the graphic photographs of J.S.'s injuries, that evidence Atkinson's intent to kill J.S.

*See McEwen,* 695 N.E.2d at 87 (finding that the evidence was weak to support an instruction on involuntary manslaughter because McEwen denied hitting the victim, "a disclaimer of *any* criminal intent[,]" and McEwen "staked everything on a defense of accident" and, accordingly, "offered an alternative account of events that foreclosed any middle ground as to his intent").

[42] Accordingly, we cannot find an evidentiary dispute regarding Atkinson's intent to kill. The trial court did not err in failing to give the involuntary manslaughter instruction.

## Conclusion

[43] The trial court did not err in failing to give the jury Atkinson's proposed jury instructions regarding reckless homicide and involuntary manslaughter. We affirm.

[44] Affirmed.

Riley, J., and Mathias, J., concur.